In the Matter of VINCENT J. YARDUM, an Attorney, Respondent.

First Department, November 5, 1926.

Attorney and client — disciplinary proceedings — respondent who had practiced about one year failed to disclose his relationship as attorney for mortgagee of unrecorded mortgage in having mortgage assigned to owner of premises — respondent drew and witnessed agreement assigning $2,500 mortgage for $2,000 to be paid in installments — respondent advised his client in foreign language to sign agreement, stating that it was invalid and remaining $500 could be collected — when $2,000 was paid client refused to assign mortgage to owner but did assign it to another who began foreclosure through respondent — foreclosure was not prosecuted — respondent censured.

In proceedings to discipline the respondent, an attorney, it appears that the respondent after practicing about one year and while representing the mortgagee of an unrecorded mortgage in a transaction with the owner of the premises, out of which an assignment of the mortgage was made to the owner, failed to disclose his relationship as an attorney for the mortgagee, although asked about it by the owner of the premises; that he drew and witnessed an agreement to assign said mortgage on which there was $2,500 due; that said agreement provided that when $2,000 was paid, the mortgagee would assign the mortgage to the owner; that respondent talking to the mortgagee in a foreign language advised him to sign the agreement and told him that it was invalid and he could fight for the remaining $500; that when the money was paid by the owner of the premises, the mortgagee refused to assign the mortgage as agreed, but did assign the mortgage to a third person, and the respondent commenced a foreclosure action on the mortgage but failed to prosecute the same. Respondent admitted the facts but contended that he was justified in not disclosing his relationship on the ground that the owner of the premises was not honest. Respondent, however, was bound by the canons of professional ethics to disclose his relationship as an attorney when inquiry was made. Furthermore, it was unethical for the respondent to advise his client to sign an agreement which he thought was invalid, though he gave the owner of the premises the impression that the agreement for the assignment of the mortgage was valid.

The respondent is censured merely for his unethical conduct, in view of the short time that he has been practicing, and in view of the fact that he did not seek any financial gain by his conduct.

DISCIPLINARY proceedings instituted by the New York County Lawyers Association.

*Richard H. Clarke* of counsel [*George R. Adams*, attorney], for the petitioner.

*Paul Koch*, for the respondent.

CLARKE, P. J. The respondent was admitted to practice as an attorney and counsellor at law in the courts of this State at the April, 1920, term of the Appellate Division, First Department.

The petition charges the respondent with unprofessional conduct,

the specification being as follows: "That on or about the 8th day of January, 1924, the Amleht Realty Corporation took title to certain premises known as 313 West 100th Street, Borough of Manhattan, City of New York. That thereafter and in the month of February, 1924, one Garabed H. Paelian communicated with Otto G. Manss, president of the Amleht Realty Company, advising said Manss that he, Paelian, held a mortgage upon said premises, which mortgage had not been recorded. That this was the first notice the said Amleht Realty Company had of said mortgage.

" That thereafter Paelian and the respondent entered into negotiation with reference to said mortgage and an agreement was reached that said Paelian was to assign the said mortgage to the said Manss on consideration of Two thousand ($2,000) Dollars. That the said agreement so made was reduced to writing in form as follows:

" ' O. G. MANSS
' Real Estate
' 119 East 28th Street
' New York

" ' Phone
' 9127 Mad. Sq.                                   *February* 5, 1924.

" ' Received from O. G. Manss three checks totaling ($2,000.00) Two thousand dollars, one for Seven Hundred and fifty ($750.00) dated this day, a second for Seven hundred and fifty dollars ($750.) dated February 25, 1924, and a third of Five Hundred Dollars ($500.) dated March 5, 1924. When all of said checks are paid I hereby agree to assign all my right, title and interest in the unrecorded mortgage made by Ararat Realty Corporation in the sum of Two thousand Five hundred Dollars ($2500.) said mortgage being dated December 26, 1922.

' ' G. H. PAELIAN,
' 546 W. 186th St.

" ' Witness                                   New York, N. Y.
' VINCENT J. YARDUM,
' 276 5th Ave. Room 402
' New York City, N. Y.'

" That thereafter the said Manss duly and fully paid the sum of Two thousand ($2000) Dollars to Paelian and fully performed the said agreement. That thereafter the said Manss demanded an assignment of the said mortgage by the said Paelian, who through the respondent above named refused to comply unless the further sum of $500 was paid to him.

" That thereafter and on or about the 2nd day of July, 1924, the respondent caused to be served upon the Amleht Realty Corporation a summons and complaint in an action to foreclose the

said mortgage for non-payment of the alleged balance of Five hundred dollars of principal and interest, the plaintiff in said action being an assignee of Paelian, named Harry Donabedian. That on or about the 2nd day of July, 1924, the respondent caused a *lis pendens* to be filed in the office of the Clerk of New York County, affecting the premises above mentioned and other premises owned by the Amleht Realty Corporation, the complaint being unverified. That the defendant, the Amleht Realty Corporation noticed the case for trial and filed a note of issue for the November, 1924 term, upon the failure of the respondent to notice the case for trial or put it on the calendar. That the respondent on successive days, asked for adjournments until an inquest was ordered by Mr. Justice TIERNEY, who directed a judgment that Donabedian, the plaintiff in said action, execute and deliver to the Amleht Realty Corporation the bond and mortgage and a satisfaction thereof.

" That at no time during the negotiation for settlement did the respondent intend to carry out its terms, on the contrary at all the times during the negotiations with the said Manss secretly, fraudulently and wilfully intended to demand and sue for the Five hundred ($500) dollars, alleged balance due to his client, Paelian. That for the purpose and with the intent to defeat the settlement aforesaid deceitfully made by the said respondent herein, the respondent improperly commenced the action above mentioned and improperly and unprofessionally filed or caused to be filed a *lis pendens* upon property in no wise covered by the said mortgage or likely to be affected by a foreclosure thereof.

" That the conduct of the respondent above named was the result of trickery, fraud and gross unprofessional practice on the part of the respondent above named."

The answer of the respondent, in substance, admits the allegations above set out, except that he denies that in February, 1924, as alleged, was the first time that the Amleht Realty Corporation had notice of the existence of the mortgage above mentioned, or that he acted fraudulently in the transaction, or that his conduct was the result of trickery, fraud and gross unprofessional practice.

The facts are practically undisputed, the respondent admitting the essential allegations of the petition. One George H. Paelian loaned $2,500 to the Ararat Realty Corporation, which was controlled by Mr. Boyajian, and received a bond and second mortgage for that amount. This mortgage was unrecorded. Thereafter Mr. Boyajian, who controlled the Ararat Realty Corporation, died. The mortgagee then visited his attorney, the respondent herein, and explained the entire situation to him.

Thereafter by appointment the mortgagee, Paelian, and the respondent visited the office of Mr. Otto G. Manss, who controlled the Amleht Realty Corporation, to which had been transferred by the Ararat Realty Corporation the premises which had been mortgaged to Mr. Paelian for $2,500. At that conference Mr. Paelian, the mortgagee, was asked by Mr. Manss whether or not the respondent was the attorney for Mr. Paelian, the mortgagee, and he replied in the negative, and this was not denied by the respondent, although present at the interview. As an outcome of the conference the agreement hereinbefore set up was executed, which was written on a typewriter by the respondent, who also witnessed it. The result of said agreement was that the claim by the mortgagee, based upon his unrecorded mortgage for $2,500, was settled for $2,000 by a written agreement of settlement, drawn and witnessed by the respondent. The three checks mentioned in the agreement were paid. Notwithstanding the payment of the checks and the terms of the written agreement the respondent refused to return the mortgage in question or to have his client execute an assignment thereof, and demanded the payment of $500 with interest. Upon the refusal by Mr. Manss to pay the $500 the respondent caused his client, Paelian, the mortgagee, to assign the bond and mortgage to a third party, and the respondent commenced suit for the foreclosure of the mortgage, alleging that the $500 remained due and unpaid, and caused to be filed a *lis pendens* against the premises covered by the mortgage, and other property of the defendant corporation. The result was that the Amleht Realty Corporation was obliged to retain counsel to defend the foreclosure suit. When the case was reached for trial, neither the respondent nor his client appeared and the complaint was dismissed.

The respondent testified under cross-examination as follows: " Q. When you called with your client, Mr. Paelian, on Mr. Manss, in February, 1924, you were then acting in a professional capacity for Mr. Paelian? A. Yes. Of course, that has to be coupled with the fact that he was my personal friend, but at the same time I was his attorney. Q. At that time? A. Yes, sir. Q. Do you mind stating why you did not disclose to Mr. Manss you were an attorney when you called at that time? A. Well, not for any particular reason. No question was ever put to me. I will say this: That if I had been dealing with men that I thought were honest, I would probably have volunteered the information; but you must remember that I went there believing honestly that these two men that were defrauding my client. I did not, in a way, feel any great obligation toward them."

The witness Manss testified referring to this interview: " Q.

Will you tell us, please, the conversation which was held at that time?  A. Mr. Paelian came in to see me with a gentleman.  After a little conversation I said to him: ' Who is the gentleman that is accompanying you; is he your lawyer? '  He said: ' No, sir, he is not.'  Q. Were you referring to the respondent?  A. I was, and he said he was not."

The gravamen of the charge is that at the time the agreement was made the respondent and his client had no intention to comply with its conditions; that Manss was induced to turn over $2,000 to respondent for his client, and did so in good faith, taking for granted that he would receive the papers when the checks were paid.

The testimony of the respondent in this record is as follows: " Q. And at the time your client got the Two thousand dollars from Manss, was it in your mind not to comply with the terms of this contract?  A. Well, not specifically in that form.  But I did tell to my client that we would fight for the balance; I did not recognize that agreement that he was signing would be upheld in a court of law.  Q. Did you tell Manss that you were going to fight for the balance?  A. No, I did not.  Q. Never did?  A. No, sir. Q. Until after the third check was paid?  A. Yes, sir.  Q. Manss was misled, was he not, by this agreement?  A. That I could not say.  I will say probably."

Paelian's testimony as to the occurrence at the time of the settlement is as follows: " Q. So, was it your idea to take the Two thousand dollars and refuse to assign the mortgage, and then fight for the balance; was that your idea?  A. Well, when I turned to him, Mr. Yardum gives me that idea.  Q. He gave you that idea? A. He gave me that idea, yes.  Q. In other words, he suggested to you —— A. When he saw I hesitated signing the paper, losing $500, he said, ' You sign that.'  He said: ' I would advise you to sign it and we will fight for the rest, for the balance.'  Q. And that was said in Armenian?  A. Yes.  Q. And Mr. Manss does not understand Armenian?  A. As far as I know he does not.  Q. He is not an Armenian?  A. He is not an Armenian, as far as I know. Of course, I know he is not.  Q. Then, at that time, did you have any conversation with Mr. Yardum about this matter.  A. Just when he told me, that is, we can fight for the balance, he said that way, just what I told you, that is all he said, nothing more, after that until the checks were paid.  Q. So that you intended at the time you signed this contract to assign the mortgage, not to do so?  A. Yes, I was feeling all the time, I was forced to sign it, and I think I will carry the fight on after that."

The respondent testified that he told his client that he might sign the agreement then; that it was a nullity, and to take what he

could get and fight for the rest of his money. He also testified that he so advised his client in the Armenian tongue which he knew Manss did not understand.

The learned referee to whom this matter was referred says in his report:

"It is not necessary to impugn the motive of the respondent in negotiating with Manss. He may have been, and probably was, wholly sincere in the belief that he was dealing with a man whom he thought was dishonest, but such belief fails to establish an adequate excuse for ignoring the facts disclosed tending to show the suppression and concealment of material facts in the course of the respondent's dealing with Manss. He chose an unwise and improper way to right an assumed and unproved wrongful act of Manss.

"The determining factor in this proceeding is not the integrity or unworthiness of Manss, but rather whether the acts and conduct of the respondent misled and induced Manss to pay the Two thousand dollars on the faith of a written contract, typewritten and witnessed by the respondent. It is not disputed that Manss gave us the checks for $2000. on the written promise that he was to receive the papers when the checks were paid. It is not disputed that when the contract was signed, the respondent advised his client he would not be obliged to carry out its conditions, but that he should take the two thousand dollars and make a fight for the balance of the money, and as has been stated, this advice was given at the time by the respondent to his client in a foreign tongue unknown to Manss. The respondent asserted that he was very scrupulous in maintaining the ethical standards of the profession, and he believed that he did not violate the same in this transaction in that he believed that he was dealing with a dishonest party. Had he referred to the Canons of Professional Ethics* he would have ascertained that it is incumbent upon a lawyer, particularly to avoid anything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law. It is unethical for a lawyer to conceal his attorneyship. This rule is especially applicable when the lawyer deals with a layman. The office of attorney does not demand of the lawyer for any client the violation of law or any manner of deception. The lawyer owes zeal and devotion to the interests of his client, and nothing more than this. My conclusion on all the facts and circumstances disclosed on the hearing is that the conduct of the respondent was professionally unethical because he did not disclose his attorneyship at the time the contract was made, and in

---

* See canons 9, 15, 26.— [REP.

First Department, November, 1926. [Vol. 218

misleading Manss into making and delivering three checks for two thousand dollars on the faith of the written agreement that the papers were to be delivered to him when the checks were paid; in advising his client to sign the agreement and to receive the checks for two thousand dollars, and withholding from Manss the predetermined intention not to perform the terms of the contract, in refusing on demand by Manss to deliver the papers under the terms of the agreement unless five hundred dollars or more be paid, and in advising the assignment of the mortgage and acting as attorney for the assignee of the mortgage with a knowledge of all the facts and circumstances of the transaction."

We entirely agree with the views of the learned official referee as thus stated and approve of his conclusion that the respondent was guilty of unprofessional conduct. We have now to consider what the punishment should be. The learned referee reports that at the time of the transactions here involved the respondent had practiced law continuously only for about a year. His practice consisted of collecting accounts and the bringing of actions involving small amounts. When he was retained to safeguard the interests of his client in this matter, though apparently an intelligent young man, he lacked the ripe experience of a tried lawyer. He impressed the referee as a man and lawyer who may have erred, but not likely to repeat the offense. In this transaction he was not, apparently, influenced by pecuniary gain. His character and professional reputation theretofore has been blameless and unchallenged and reputable witnesses have testified to his general good character. In addition to this at the close of the testimony the referee said to the respondent, then upon the stand: " The suggestion in the charge is not that you were disloyal to your client. The suggestion is that in your loyalty to your client you misled some one else into belief that a settlement had been made, relying upon a paper that was executed at his dictation and which you witnessed. Q. As a member of the bar, do you think it was fair dealing with the man whom you thought was dishonest himself, to mislead him into giving you two thousand dollars, or your client two thousand dollars, based upon a settlement which you did not intend to carry through? A. No, I shall be inclined to agree with you, sir, that perhaps I should not, because not only of these proceedings, but because of conversations that I had with the members of the Bar Association, where, although they speak of the mitigating circumstances, nevertheless have directly or indirectly condemned it. Now, I am willing to change my mind and say I was wrong."

We are of the opinion that in consideration of the respondent's previous good character, the short time he had been at the bar,

the fact that his conduct was not actuated by the hope of personal gain, and that he now recognizes its impropriety, the ends of justice will be fully satisfied by our decision that the conduct of the respondent complained of was unethical and improper and deserving of censure by this court, which is hereby administered.

DOWLING, MERRELL, McAVOY and BURR, JJ., concur.

Respondent censured.   Settle order on notice.